IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

SAMUEL LEWIS CARTER
    Plaintiff,

-vs-

COUNTY OF HAYS,
    Defendant.

CAUSE NO.:
AU-17-CA-00691-SS

2019 FEB -4 AM 11: 54

# ORDER

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendant County of Hays (the County)'s Motion for Summary Judgment [#21], Plaintiff Samuel Lewis Carter's Response [#22] and Supplemental Response [#29-2] in opposition, the County's Reply [#48] in support, and Carter's Surreply [#44-1] in opposition. Having reviewed the documents, the governing law, the arguments of counsel, and the file as a whole, the Court now issues the following opinion and order.

## Background

This is an employment discrimination case. Plaintiff Samuel Carter was hired by the Hays County Juvenile Center (the Juvenile Center) as a part-time Juvenile Supervision Officer (JSO) in 2012. Resp. [#22-1] Ex. A (Carter Aff.) at 2.[1] Between 2012 and 2016, Carter was promoted several times, eventually becoming a Shift Supervisor at the Juvenile Center. *Id.* Even so, Carter's employment history at the Juvenile Center was not unblemished, and between 2014 and 2016, Carter was suspended without pay on three different occasions. Mot. Summ. J. [#21-2] Ex. A at 79–89, 99–101; 107–11.

In February 2016, Carter sustained a serious left-shoulder injury in a high-speed motor vehicle accident and took a leave of absence from the Juvenile Center in order to receive medical

---

[1] For the sake of consistency, all page number citations refer to CM/ECF pagination.

1

treatment and therapy to restore functionality in his left arm. *Id.* Although he made progress in regaining use of his arm during this leave of absence, Carter alleges he still had difficulty performing simple tasks with his injured arm when he returned to work in August 2016. Resp. [#26-6] Ex. K-23 (Physical Therapist Letter) at 1; Carter Aff. at 2–3. In light of these limitations, Carter's physical therapist advised that Carter likely lacked the ability to restrain or detain juvenile offenders until he regained further strength in his injured arm. Physical Therapist Letter at 1.

Before the accident, Carter served as one of two Shift Supervisors during the 2pm–10pm shift at the Juvenile Center along with a coworker, John Dehkordi. Carter Decl. at 4. Although both Dehkordi and Carter served as coequal Shift Supervisors, Carter served as the "lead" Shift Supervisor due to his seniority. *Id.* at 4. As "lead" Shift Supervisor, Carter led the daily shift briefing and determined how to implement the schedule for the day. Carter Aff. at 5–7; Dehkordi Aff. at 1–2. Aside from these "lead" responsibilities, Carter and Dehkordi carried out "basically . . . the[] same duties." Carter Aff. at 5–7.

During Carter's leave of absence, Dehkordi took over as lead supervisor during the 2pm–10pm shift. Carter Aff. at 6. Dehkordi retained the "lead" role when Carter returned to work in August 2016. *Id.* Because Carter's physical therapist had recommended he be placed on light duty and because Carter's injured arm impeded his ability to restrain juveniles, Carter was temporarily assigned to work in the control room. *Id.*; Dehkordi Aff. at 2–3; Physical Therapist Letter at 1. A contemporaneous memorandum explained that "injuries among staff have led to various challenges specifically on the PM shift" and that the Shift Supervisors' roles were being temporarily redefined "[d]ue to certain Shift Supervisors being restricted to light duty." Resp. [#25-4] Ex. G-50 (PM Shift Memorandum) at 2–3. "Light duty" meant Carter was not to leave

2

the Control Room or put himself into a situation in which he was alone with a juvenile detainee. *Id.*

Carter's control room assignment did not affect his rank as a Shift Supervisor. *Id.* Carter also retained the majority of his job responsibilities. *See id.* Carter did, however, lose "lead" duties, such as conducting the daily shift briefing, as well as two Shift Supervisor responsibilities—managing the floor and supervising male dorm rooms—which would have contravened Carter's light-duty restrictions by putting him in a position in which he might need to restrain juveniles. *See* Physical Therapist Letter; PM Shift Memorandum; Carter Aff. at 5–6.

In late September 2016, Carter received a call from a former juvenile, Nico Peters, requesting help in accessing records kept by the Juvenile Center. Carter Aff. at 8. Carter agreed to help, and on September 25, 2016, Carter went into work early to look for Peters's records. *Id.* After arriving at the Juvenile Center, Carter asked the "lead" on-duty Shift Supervisor, Sandra Parra, where the former juvenile files were kept and explained that a former juvenile had requested his records. *Id.* at 8–9. In response, Parra told Carter that he should not release records without authorization from his superior. Mot. Sum. J. [#21-7] Ex. F (Parra Aff.) at 3–4. Eventually, Parra told Carter where the files were located and directed another employee, Shavonda Hill, to give Carter the keys to the file room. *Id.* at 8–9. When Carter asked if a nearby juvenile could assist him in using a dolly to retrieve Peters's records, Parra acquiesced. *Id.* Carter and the juvenile then walked down the hall to the file room and retrieved the file without incident. *Id.* Carter contends the juvenile assisting him was at all times in full view of Parra and Hill. *Id.*[2] After locating the file, Carter made copies of the records and faxed them to a third party

---

[2] Carter suggests the County destroyed a videotape depicting these events. Resp. [#22] at 30–31. The Court does not consider these allegations at this time because Carter has neither moved to sanction the County nor established that the County destroyed the videotape with a culpable state of mind.

3

at Peters's request. *Id.* For her part, Parra reported Carter's actions to her supervisor. Parra Aff. at 3–4.

On September 28, 2016, the Assistant Facility Administrator, Joel Ware, told Carter he was being given a three-day suspension. Carter Aff. at 10; Mot. Summ. J. [#21-2] Ex. A at 3, 9–10. Contemporaneous paperwork indicates Carter was suspended for "violat[ing] the Duties and Expectations of PM Shift Supervisors" by leaving the control room—despite his injured shoulder and light-duty designation—and interacting with a juvenile detainee. *Id.* at 114–15.

On October 4, 2016, Ware and Facility Administrator Brett Littlejohn reconsidered Carter's suspension and ultimately decided to fire Carter, who is African American, for (1) violating Texas law and Juvenile Center policy by releasing juvenile records without authorization from a superior; and (2) putting himself in a dangerous situation and contravening his "light duty" order by leaving the Control Room and walking down the hallway to the storage room with a juvenile detainee. *Id.* at 9–10. Ware later explained that he and Littlejohn had decided to change Carter's sanction from suspension to termination because of the seriousness of Carter's misjudgment in releasing Peters's records. Resp. [#25-1] Ex. G-33 at 13. The Juvenile Center later hired Christopher Young, an African American, to serve as a Shift Supervisor on the 2pm to 10pm shift. Dehkordi Aff. at 3. Dehkordi, who is Caucasian, continued to serve as the "lead" Shift Supervisor. *Id.*

On October 6, 2016, Carter filed a complaint with the Texas Workforce Commission (TWC) alleging discrimination on the basis of race and disability. Am. Compl. [#16] at 3–4. The Commission subsequently issued a right to sue letter, and in July 2017, Carter filed suit against the County in state court. Notice Removal [#1-1] Ex. A at 2; Am. Compl. [#16] at 3–4. The

4

County then removed the action to this Court on the basis of federal question jurisdiction. Notice Removal [#1] at 2.

## Analysis

I.  **Legal Standard**

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing

summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*

"Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## II. Application

Carter brings a racial discrimination claim under 42 U.S.C. § 2000e–2(a) and a disability discrimination claim under 42 U.S.C. § 12112.[3] Because Carter's claims are based on circumstantial evidence, the Court reviews both claims under the *McDonnell Douglas* burden-shifting framework. *See Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004) ("Federal employment discrimination claims based on circumstantial evidence are reviewed under the burden-shifting framework outlined in *McDonnell Douglas*." (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case by producing evidence in support of each element of the claim. *McKinsey*, 375 F.3d at 360 (noting

---

[3] At least, the Court assumes that Carter seeks to bring his disability discrimination claim under § 12112. None of Carter's filings identify the statutory provisions under which Carter seeks to bring his claims. *See* Am. Compl. [#16] at 3–4 (identifying Carter's cause of action as "discrimination" but failing to cite any statutory provisions); Resp. [#22] at 23–27 (citing to the ADA definition of "disability" but failing to identify which provisions of the ADA were violated).

burden is one of production, not persuasion). If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate some legitimate reason for the employer's action. *Id.* Once the employer articulates a legitimate reason for the action, the burden then shifts back to the plaintiff to "demonstrate the employer's proffered explanation is unworthy of credence." *Id.* The plaintiff can meet this burden by providing evidence that creates a genuine issue of material fact as to whether the employer's proffered reasons for taking the action are merely pretext for discrimination or as to whether a protected trait of the plaintiff was a motivating factor in the employer's decision. *Id.*; *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013) ("An employee who alleges status-based discrimination under Title VII need [only] . . . show that the motivate to discriminate was one of the employer's motives."); *EEOC v. LHC Grp.*, 773 F.3d 688, 694–97 (5th Cir. 2014) ("An employee [alleging discrimination under the ADA] who fails to demonstrate pretext can still survive summary judgment by showing that . . . [an] illegitimate motive was a motivating factor in the [employment decision].").

### A. Racial Discrimination Claim

In order to establish a prima facie case of employment discrimination under § 2000e–2(a), Carter must show (1) he was a member of a protected class; (2) he was qualified for the position in question; (3) he was subject to an adverse employment action; and (4) he was replaced by someone outside the protected class or treated less favorably than other similarly situated employees outside the protected class. *Bryan*, 375 F.3d at 360 (5th Cir. 2004).

The parties agree that Carter, an African American, is a member of a protected class and was qualified for his position. They dispute, however, whether Carter was subject to an adverse employment action and whether Carter was replaced by someone outside the protected class or

treated less favorably than other, similarly situated employees. The Court considers these issues in turn.

### 1. Adverse Employment Action

The Fifth Circuit has interpreted the term "adverse employment action" to encompass "'ultimate employment decisions' such as hiring, firing, demoting, promoting, granting leave, and compensating." *Thompson v. City of Waco*, 764 F.3d 500, 503–05 (5th Cir. 2014). Additionally, a reduction in job responsibilities may sometimes qualify as an adverse employment action if the loss of responsibilities is so significant as to constitute a demotion. *Id.* at 504–05.

Carter argues he was subject to two adverse employment actions. First, Carter contends he suffered an adverse employment action when the Juvenile Center terminated his employment. Resp. [#22] at 5–8. The County concedes that this qualifies as an adverse employment action. Mot. Summ. J. [#21] at 2–3. Second, Carter contends he suffered an adverse employment action when Dehkordi retained the role of "lead" Shift Supervisor following Carter's return to work in August 2016. Resp. [#22] at 5–8.

As a predicate matter, the County argues the Court should not consider Carter's argument that he was discriminatorily demoted because (1) Carter has not exhausted administrative remedies as to his demotion because Carter did not mention his demotion in his EEOC charge; and (2) Carter's complaint does not mention his alleged demotion as a basis for his discrimination, and claims may not be raised for the first time in response to a motion for summary judgment. Reply [#48] at 6–7. Neither argument is persuasive. The former argument— that Carter did not exhaust administrative remedies—fails because although exhaustion of administrative remedies is required for Title VII claims, plaintiffs may nevertheless pursue

8

claims that were not asserted before the EEOC "if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charges that were made." *Lumhoo v. Home Depot USA, Inc.*, 229 F. Supp. 2d 121, 131–32 (E.D.N.Y. 2002) (cleaned up) (relying on *Fitzgerald v. Henderson*, 251 F.3d 345, 358–60 (2d Cir. 2001)); *see also Vuyanich v. Republic Nat'l Bank of Dallas*, 723 F.2d 1195, 1201 (5th Cir. 1984) ("T[he] reasonable expectation rule requires that the scope of allegations made in a judicial complaint be 'like or related to' allegations made in the EEOC charge."). Here, the Court concludes Carter's alleged demotion was sufficiently close in time to his eventual termination that the demotion could be expected to fall within the scope of an EEOC investigation of Carter's charge. As to the latter argument, the County is correct that Carter's demotion theory is not properly before the Court because it is not alluded to in Carter's complaint. *See* Am. Compl. [#16] at 3. But the Court is not entitled to ignore Carter's new factual theory altogether. Rather, district courts construe such newly raised factual allegations as a motion to amend. *Riley v. Sch. Bd. Union Par.*, 379 F. App'x 335, 341 (5th Cir. 2010) (per curiam).[4]

The Court therefore proceeds to consider whether Carter is entitled to amend his complaint to add his discriminatory demotion theory. Under Federal Rule of Civil Procedure 15, courts must grant leave "when justice so requires." FED. R. CIV. P. 15(a)(2). In practice, this means that courts may not deny leave to amend unless presented with a substantial reason for doing so, such as undue delay, bad faith, dilatory motive, repeated failures to cure deficiencies,

---

[4] There appears to be some confusion in the Fifth Circuit on this issue. *Compare Riley*, 379 F. App'x at 341 ("Under our precedent, when a claim is raised for the first time in response to a summary judgment motion, the district court should construe that claim as a motion to amend the complaint . . . ."), *with Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 114 (5th Cir. 2005) (affirming summary judgment against plaintiff where district court refused to consider one of plaintiff's claims on the ground it was first raised in response to the motion for summary judgment and thus was "not properly before the court"). In an abundance of caution the Court opts to construe Carter's newly raised allegations as a motion to amend. *See Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 989 n.2 (5th Cir. 2008) (concluding district court did not err by considering and granting summary judgment on claim raised by plaintiff for the first time in response to motion for summary judgment).

futility, or undue prejudice to the opposing party. *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 425 (5th Cir. 2004); *Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 873 (5th Cir. 2000).

The Court concludes leave to amend should not be granted because amendment would be futile. Carter effectively seeks leave to amend his complaint to bring a racial discrimination claim based upon his alleged demotion from "lead" Shift Supervisor. But Carter's alleged demotion from "lead" Shift Supervisor cannot serve as the basis for a viable racial discrimination claim because Carter's alleged demotion does not qualify as an adverse employment action. For starters, although Carter considers his loss of the "lead" role to be a demotion, Carter was not actually demoted. Rather, he retained his title and his pay remained the same when he returned from his leave of absence. *See* Resp. [#22-2] Ex. B (Dehkordi Aff.) at 2 ("Each shift had two Shift Supervisors of equal rank[;] however, the lead shift supervisor that had the most seniority . . . would take the 'lead.'"); PM Shift Memorandum at 3 ("Shift Supervisors are all equal and do not out rank each other.").

Nor did Carter suffer a loss of job responsibilities tantamount to a demotion. *See Thompson*, 764 F.3d at 504. Upon his return to work, Carter and Dehkordi bore largely the same job responsibilities, including "following the daily schedule," "responsibility for staff coverage," "communicating concerns with Shift Supervisors in regards to the PM Shift," and "training and mentoring staff." PM Shift Memo at 2–3. Though Carter did lose two of his Shift Supervisor duties—managing the floor and "male dorm movement"—this reduction in duties was temporary and premised upon Carter's light-duty status while he recovered from injury, not upon his loss of the "lead" role. *See* Physical Therapist Letter at 1 (advising Carter be restricted to light duty and "desk/computer work"). Carter also lost some "lead" duties, such as conducting the daily shift

briefing. Resp. [#22] at 6.[5] But the "mere loss of some job responsibilities" does not rise to the level of an adverse employment action, *Thompson*, 764 F.3d at 504, and the Court concludes that Carter's loss of these duties while on light-duty status is not so significant that it amounts to an adverse employment action sufficient to support a prima facie case of employment discrimination.

Comparison with *Thompson* is instructive. In that case, a detective was stripped of the "'integral and material responsibilities of a detective'" such that he could no longer log evidence, be the affiant in a criminal case, work undercover, or serve as an evidence officer at a crime scene. *Thompson*, 764 F.3d at 505. The Fifth Circuit concluded the detective's job description had been rewritten and restricted to such an extent that he no longer occupied the position of detective but instead effectively served as an assistant detective. *Id*. *Thompson* deemed this permanent loss of the detective's "essential job functions" to be "the equivalent of a demotion." *Id*.

Here, by contrast, Carter retained all of the duties of a Shift Supervisor save those he was temporarily unable to perform while on light duty. *See* PM Shift Memorandum at 3. And unlike the detective in *Thompson*, Carter has not pointed to any evidence suggesting this loss of job responsibilities was permanent. To the contrary, all indications suggest Carter's loss of job responsibilities was a temporary consequence of his physical therapist's recommendation that he be restricted to light duty. For example, the PM Shift Memo explicitly noted that Carter's role as

---

[5] Neither party explains how, exactly, Carter lost the "lead." In his affidavit, Carter explains that Dehkordi "stayed [on]" as the "lead" Shift Supervisor after Carter returned to work, but he does not elaborate as to who decided Dehkordi should stay on as lead nor as to who allegedly told Carter he was no longer lead. Carter Aff. at 6. Similarly, Dehkordi's affidavit explains that he continued as "lead" Shift Supervisor because Carter was on light duty but does not state who decided he would stay on as "lead." Dehkordi Aff. at 2. And although Carter claims in his response that the PM Shift Memorandum documented his demotion from "lead" Shift Supervisor, Resp. [#22] at 7, the PM Shift Memorandum says nothing of the sort. It does, however, explicitly disclaim the existence of a "lead" designation and reiterate that all Shift Supervisors stand on equal footing. *See* PM Shift Memorandum at 3 ("All male and female Staff will report to any one of their Shift Supervisors[,] [and] Shift Supervisors are all equal.").

"Shift Supervisor posted in [the] Control [Room]" was a "temporary assignment," *id.*, and Dehkordi similarly qualified his continuation as "lead" Shift Supervisor as dependent upon Carter's light-duty status. *See* Dehkordi Aff. at 2 ("Carter was on light duty and could not restrain juveniles, so he worked the control room[,] [while] I continued as the lead Shift Supervisor for the 2pm shift.").[6] Carter did lose some job responsibilities associated with the 'lead,' such as giving the daily briefing, Carter Aff. at 5–6, but these ancillary duties were not so integral and material to Carter's job as Shift Supervisor that their loss might constitute a demotion. All in all, the Court concludes that neither Carter's temporary reduction in responsibilities while on light duty nor his loss of the informal right to "task and assign" duties as "lead" Shift Supervisor constitutes a substantial loss of job responsibilities tantamount to a demotion.

In sum, Carter's termination qualifies as an adverse employment action. But Carter's informal demotion from "lead" Shift Supervisor does not, and the Court therefore denies Carter leave to amend his complaint with allegations that his demotion was discriminatory.

### 2. Disparate Treatment

Disparate treatment occurs when an employer treats an employee differently because of a protected trait of that employee, such as race, color, religion, sex, or disability. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52–53 (2003). Plaintiffs seeking to establish a prima facie case of racial discrimination under *McDonnell Douglas* can demonstrate disparate treatment by showing either that they were fired and then replaced by someone outside the protected class, or alternatively,

---

[6] Carter argues his light-duty status did not preclude resumption of his role as "lead" because in the event he needed to enter the "main floor," he could simply have required an officer to accompany him to restrain juveniles if necessary. Resp. [#22] at 10; Carter Aff. at 6. Yet this is beside the point, because regardless of whether or not Carter could have handled "lead duties" with accommodations, he has still failed to show that his loss of "lead" duties was anything but temporary. And insofar as the evidence suggests Carter suffered a temporary loss of job duties, the Court concludes Carter has not identified a genuine issue of material fact as to whether he suffered a substantial loss of job responsibilities equivalent to a demotion.

that they were treated less favorably than other similarly situated employees. *Bryan v. McKinsey & Co., Inc.*, 375 F.3d 358, 360–61 (5th Cir. 2004). Employees qualify as similarly situated when they occupy "nearly identical circumstances." *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259–60 (5th Cir. 2009).

In the first instance, Carter argues he was replaced by someone outside his protected class because Dehkordi effectively replaced him as "lead" Shift Supervisor. Resp. [#22] at 29–30. But as explained above, Carter cannot establish a prima facie case of employment discrimination with respect to his loss of "lead" duties because the loss of such duties does not qualify as an adverse employment action. *See supra* Section II.A.1. It is thus irrelevant whether or not Dehkordi replaced Carter as the "lead." Conversely, although Carter *has* established that he suffered an adverse employment action when his employment was terminated, Carter cannot show that he was replaced by someone outside his protected class because the person hired to fill the vacancy created by Carter's termination, Christopher Young, was also African American. Mot. Summ. J. [#21-3] Ex. B at 33–34.

Next, Carter argues he has established disparate treatment because he has shown he was treated less favorably than another similarly situated employee, Sandra Parra. Resp. [#22] at 16–18, 28–30.[8] Obviously, Carter was treated less favorably than Parra—Carter was terminated, and Parra was not. The County argues, however, that Carter cannot establish disparate treatment because Parra and Carter were not similarly situated. Reply [#48] at 5–6.

---

[8] In his surreply, Carter contends for the first time that he was also treated less favorably than the Facility Supervisor, Brett Littlejohn. *Cf.* Resp. [#22] at 30 (arguing only that Carter was similarly situated to Parra). Carter waived this argument by failing to raise it in his response. *See, e.g., Branch v. CEMEX, Inc.*, No. H–11–1953, 2012 WL 2357280, at *9 (S.D. Tex. June 20, 2012) ("Legal arguments raised for the first time in a surreply, like arguments raised for the first time in a reply, are waived.").

The Court agrees that Carter and Parra were not similarly situated. Carter argues he was similarly situated to Parra because, according to Carter, Parra implicitly condoned Carter's actions when she gave him access to the file room and allowed him to walk down the hall with a juvenile despite his light-duty status.[9] Resp. [#22] at 16–18, 28–30. But standing by while a coworker commits misconduct is not the same as committing such misconduct oneself. What's more, though Parra did not block Carter from accessing the control room or walking down the hall with the juvenile, she explicitly told Carter that he should not release records without authorization from his superior and then reported Carter's actions to her supervisor because she believed Carter intended to release the records without such authorization. Parra Aff. at 3–4. And finally, aside from their divergent roles in the events that led to Carter's termination, Carter has not submitted evidence showing that his disciplinary history is similar to that of Parra. *See* Mot. Summ. J. [#21-2] Ex. A at 79–89, 99–101; 107–11 (detailing Carter's disciplinary history); *see also Lee*, 574 F.3d at 259–60 (noting that employees are unlikely to be similarly situated if they lack "essentially comparable violation histories"). For these reasons, the Court concludes Carter has failed to present evidence showing that Carter and Parra were similarly situated.

In sum, Carter has not established a prima facie case of racial discrimination with respect to his loss of "lead" duties or his eventual termination. Because Carter has failed to establish a prima facie case of racial discrimination, the Court grants summary judgment in favor of the County on Carter's racial discrimination claim.

---

[9] Though Parra claims she had no knowledge of Carter's light-duty restriction, Parra Aff. at 4, Carter argues Parra must have heard about his light-duty restriction through the grapevine. Resp. [#22] at 16. Despite this assertion, Carter has not identified anyone who told Parra about the light-duty restriction. *See* Dehkordi Aff. at 2 (asserting it was "common knowledge among the Shift Supervisors" that Carter's shoulder had not fully healed); *cf.* Parra Aff. at 4 (explaining that Parra did not receive the PM Shift Memo because she did not serve on that shift).

## B. Disability Discrimination Claim

Turning to Carter's disability discrimination claim, the Court first considers the County's challenges to Carter's prima facie case under *McDonnell Douglas*. Because the County does not persuade the Court that Carter has failed to make out a prima facie case, the Court then assesses whether the County has articulated some legitimate reason for the adverse employment actions taken against Carter. Finally, the Court considers whether Carter has put forward evidence creating a genuine issue of material fact as to whether Carter's disability was a motivating factor in the County's decision to terminate Carter.

### 1. Prima Facie Case

In order to establish a prima facie case of disability discrimination under the ADA, Carter must show (1) he had a disability; (2) he was qualified for the position in question; and (3) he was subject to an adverse employment decision on account of his disability. *EEOC v. LHC Grp.*, 773 F.3d 688, 694–97 (5th Cir. 2014).

The County challenges two aspects of Carter's prima facie case. First, the County argues Carter was not disabled when he returned to work in August 2016. Mot. Summ. J. [#21] at 5–8. Second, the County argues Carter's loss of "lead" Shift Supervisor duties does not qualify as an adverse employment decision under the ADA. Reply [#48] at 6–9. The Court considers each argument in turn.

#### a. Disability

Individuals qualify as "disabled" under the ADA if they (1) have a "physical or mental impairment that substantially limits one or more major life activities"; (2) have a record of such an impairment; or (3) are regarded as having such an impairment. 42 U.S.C. § 12102(1).

The County argues Carter has not produced evidence showing that he was disabled at the time of his termination. Mot. Summ. J. [#21] at 6. To the contrary, however, Carter has submitted an affidavit declaring that he had "very little strength" in his left arm when he returned to work and that he "could not push or pull things that had any significant amount of weight or resistance" when he returned to work. Carter Aff. at 2–3. Carter also points to a letter from his physical therapist advising that Carter lacked the ability to restrain or detain juveniles when he returned to work in August 2016. Physical Therapist Letter at 1. This evidence is more than sufficient to meet Carter's burden of production on this element. *See McKinsey*, 375 F.3d at 360.

### b. Adverse Employment Decision

Carter claims the County discriminated against him on the basis of his disability when it effectively demoted him by revoking his "lead" Shift Supervisor duties and then terminated his employment. Resp. [#22] at 26–28. As the Court noted above with respect to Carter's racial discrimination claim, Carter raised his "effective demotion" theory for the first time in response to the County's motion for summary judgment, and the Court must therefore construe this newly asserted factual theory as a motion by Carter to amend his complaint. *See supra* Section II.A.1. The Court again concludes, as it did in the context of Carter's employment discrimination claim, that leave to amend should not be granted because amendment would be futile. Carter's temporary loss of "lead" Shift Supervisor duties simply does not qualify as an adverse employment action for purposes of establishing a prima facie case of discrimination under the ADA. *Cf. supra* Section II.A.1 (concluding Carter's loss of lead duties did not qualify as an adverse employment action for purposes of establishing a prima facie racial discrimination claim under Title VII). By contrast, Carter's termination undoubtedly qualifies as an adverse

employment action, and the remaining question is thus whether Carter has presented evidence suggesting his termination was on account of his disability.

### 2. Nondiscriminatory Reason

Because the County has not challenged any other element of Carter's prima facie case, *see* Mot. Summ. J. [#21] at 5–8, the burden shifts to the County to articulate a legitimate, nondiscriminatory reason for Carter's discharge. *McKinsey*, 375 F.3d at 360. The County has offered two such reasons, suggesting Carter was discharged both for disseminating confidential records without written authorization and for violating light-duty restrictions set out in the PM Shift Memorandum. Mot. Summ. J. [#21] at 8–9; *id.* [#21-2] Ex. A at 9–10.

### 3. Motivating Factor

The County having met its burden, the burden shifts back to Carter to put forward evidence suggesting that he was discharged because of his disability. *McKinsey*, 375 F.3d at 360. This burden is one of persuasion, not production. *Id.* Thus, in order to survive summary judgment, Carter must offer sufficient evidence to create a genuine issue of material fact as to (1) whether the County's proffered reasons for terminating Carter are merely pretext for discrimination; or (2) whether Carter's disability was a motivating factor in the County's decision to terminate Carter's employment. *See LHC*, 773 F.3d at 702 (citation and internal quotation marks omitted).

Carter argues there is a genuine issue of material fact as to whether Littlejohn's decision to change Carter's sanction from suspension to termination was a pretext for discrimination. Resp. [#22] at 19–20. During proceedings before the Texas Workforce Commission, Assistant Facility Administrator Joel Ware testified that although Carter was initially suspended for violating his light-duty restrictions, *see* Mot. Summ. J. [#21-2] Ex. A at 114–15, the Juvenile

Center eventually determined to terminate Carter because of the seriousness of Carter's lapse in judgment in disseminating the records of a former juvenile—now an adult—at the former juvenile's request. Resp. [#25-1] Ex. G-33 at 13 (testifying that Carter was terminated rather than suspended because of the "severity" of his misconduct in disclosing juvenile records). According to the County, this disclosure violated both state law and Juvenile Center policy because Carter did not receive written consent.[10] Mot. Summ. J. [#21] at 8–9; *id.* [#21-2] at 9. Carter argues this explanation for his termination is pretextual because the Juvenile Center does not actually have a policy prohibiting the sort of disclosure at issue here and because the disclosure did not violate state law. Resp. [#22] at 19–20.

As an initial matter, there is a genuine issue of material fact as to whether the Juvenile Center did, in fact, have a policy against dissemination of juvenile information without prior authorization from a superior. Littlejohn, the Facility Administrator, says that such a policy existed. Mot. Summ. J. [#21-2] at 9. Carter says it did not. Resp. [#22] at 15–16, 19–20; *id.* [#22-3] Ex. J. (Routh Dep.) at 44. And the Juvenile Center's written policies do not decisively resolve this issue, although they do repeatedly reiterate that juvenile records are "confidential" without explaining what confidentiality entails. *See, e.g.*, Mot. Summ. J. [#21-2] Ex. A at 64. Meanwhile, the Hays County Employee Personnel Policy, perhaps the most relevant of the written policies uncovered by the Court, ambiguously declares the following:

> Employees must protect against unauthorized use and/or release of Resident information, records and/or documents. Option: Employee must not release resident information, records and/or documents without prior authorization from administration.

*Id.* at 44. The Court is uncertain how to interpret an "option" for prior authorization, but viewing the Juvenile Center's written and informal policies in the light most favorable to the plaintiff, the

---

[10] The County does not specify whether this written consent is supposed to come from a supervisor or from the former juvenile.

Court concludes a fact issue exists as to whether the Juvenile Center had a policy of requiring authorization before handing over records to a former juvenile resident.

It is also unclear whether state law prohibited the disclosure at issue here. The County strenuously insists that Carter's disclosure of juvenile records violated Texas Family Code § 58.005 and § 58.106. Mot. Summ. J. [#21] at 9; Reply [#48] at 2–3. But § 58.106 addresses the dissemination of information contained within the "juvenile justice information system," a computerized database maintained by the state. Tex. Family Code §§ 58.102, 58.106. Since the records at issue here were not stored within a computerized data base, § 58.106 does not apply. Section 58.106, meanwhile, governs the confidentiality of "facility records" and requires that records and information concerning a "child" only be disclosed under certain circumstances—for example, at the request of the child's attorney. *Id.* § 58.005(a-1)(3). But it is not clear the records at issue here concern a "child," because Peters is now an adult.[11]

The Court concludes there is a genuine issue of material fact as to whether the County's termination of Carter was actually motivated by the conclusion that Carter's actions violated either these statutory provisions or Juvenile Center Policy. This issue of fact is particularly salient given the lack of negative consequences attending the disclosure, which was authorized and condoned by the former juvenile to whom the records pertained. Accordingly, because a fact issue exists as to whether the County's stated justification for Carter's termination was pretextual, the Court denies summary judgment as to Carter's disability discrimination claim.

---

[11] What's more, § 58.005 allows for disclosure to "an attorney for the child." *Id.* § 58.005(a-1)(3). Here, Peters was able to request the records himself, without assistance from an attorney, because he is now an adult. Besides characterizing § 58.005 as "strictly control[ling] the circumstances under which such records may be disclosed," the County has not explained why such disclosure would be improper. Mot. Summ. J. [#21] at 9.

## Conclusion

The County is entitled to summary judgment on Carter's racial discrimination claim under 42 U.S.C. § 2000e–2(a) because Carter has failed to establish a prima facie case of racial discrimination. But the Court denies summary judgment as to Carter's disability discrimination claim under 42 U.S.C. § 12112 because a genuine issue of material fact exists as to whether the County's stated motivation for discharging Carter was pretextual.

Accordingly,

IT IS ORDERED that the County's Motion for Summary Judgment [#21] is GRANTED IN PART and DENIED IN PART as described in this opinion.

SIGNED this the 4th day of February 2019.

/s/ Sam Sparks
SAM SPARKS
SENIOR UNITED STATES DISTRICT JUDGE